HEIDI BELL,  JARED LUNDAHL,
LOGAN LUNDAHL,  BRIGHAM
LUNDAHL,  H. LUNDAHL,
KWINCI LUNDAHL
700 S OAK STREET
KIMBALL, NE 69145-0000

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

2016 MAR 24  PM 2: 50

OFFICE OF THE CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA, NORTH PLATTE DIVISION

HEIDI  BELL;  JARED LUNDAHL;          :
LOGAN LUNDAHL, BRIGHAM
LUNDAHL, H. LUNDAHL;  and the        :
TELFORD – LUNDAHL TRUST dated          Civil No.
JUNE  15, 1993  ADMINISTERED          :
FROM THE STATE OF NEBRASKA

7: 16 CV 5001
8:16 CV 130 KLF

**COMPLAINT**

     Plaintiffs
               :

      vs.
             :

THE GERALD AND MARY LUNDAHL        :
LIVING TRUST (NOW IRREVOCABLE)  :
DATED APRIL 19, 2005;  MARY ANN
HADLEY-LUNDAHL;  LAW OFFICES OF
BROCK, MARTIN & VOORHEES, PC.   :
KENDRA MARIE WALKER;  BRIAN
DAVID HADLEY                    :

     Defendants       :

## I.  PARTIES

    1.  Plaintiff  Heidi Bell is a citizen of the state of Washington and a trustee and
beneficiary of the Telford-Lundahl Trust administered from the state of  Nebraska.

    2.  Plaintiff Jared Lundahl is a citizen of the state of Utah  and a beneficiary  of the
Telford-Lundahl Trust administered from the state of  Nebraska.

    3.  Plaintiff  Logan Lundahl is a citizen of the state of Nebraska  and a beneficiary of
the Telford-Lundahl Trust administered from the state of  Nebraska.

    4.  Plaintiff  Brigham Lundahl is a citizen of the state of Utah  and a beneficiary  of

the Telford-Lundahl Trust administered from the state of Nebraska.

5. Plaintiff H. (Holli) Lundahl is a citizen of the state of Nebraska and a trustee and beneficiary of the Telford-Lundahl Trust administered from the state of Nebraska.

6. The Telford-Lundahl Trust Dated June 15, 1993 resides and is administered from the state of Nebraska, City of Kimball.

7. Defendant "the Gerald and Mary Lundahl Living Trust (now irrevocable) dated April 19, 2005, is citizen of the state of California.

8. Defendant Mary Ann Hadley-Lundahl is citizen of the state of California.

9. Defendant the Law Offices of Brock, Martin & Voorhees, P.C. is citizen of the state of California.

10. Defendant, Kendra Marie Walker is citizen of the state of California.

11. Defendant Brian David Hadley is citizen of the state of California.

12. Because no Plaintiff is a citizen of the state of California where all Defendants are citizens, complete diversity exists among the parties as required under the federal diversity clause, 28 USC section 1332 this giving this court Subject matter jurisdiction. Finally, GERALD signed a contract to inherit permitting personal jurisdiction of this lawsuit in the forum where the Telford-Lundahl Trust resided. That forum is Nebraska.

## II. JURISDICTION AND VENUE

13. This Court had jurisdiction of the state law claims alleged herein pursuant to 28 USC § 1332(a)(1) - 28 USC § 1332(b), and 28 USC § 1332(C)(2) in that this action is between parties who are citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interests and costs. In fact, Plaintiffs allege that the estate they were promised by written contract in June of 1993 and fraudulently conveyed into the Gerald and Mary Lundahl Trust dated April 19, 2005 has a minimum net worth of $10 million.

14. Federal question jurisdiction also lies herein under the federal interpleader act, 28 U.S. Code § 1335 when the Defendants produce the life insurance policies promised by the creator of the trust, and under the Fair Debt Collection Act which addresses fraudulent transfers involving debts, i.e. 2 8 U.S. Code § 3302 et. seq.

15. Venue is proper in Nebraska because the assets converted belong to the Telford-Lundahl trust by contract dated March 9, 1994 and which contract was fully performed upon by the true children of GERALD DALE LUNDAHL.

2

### III. NATURE OF ACTION

16.     This action arises out of the misappropriation, conversion and fraudulent conveyance of separate property of the deceased GERALD LUNDAHL which GERALD LUNDAHL's true blood children had both an equitable title too, as well as a contractual right. As the underlying facts will show, the deceased's fifth wife MARY LUNDAHL procured GERALD, who was of ill health, to create a trust with assets the deceased GERALD had contracted away to his own children before GERALD met his fifth wife MARY ANN HADLEY. As such, the trust created by Gerald and Mary Lundahl in 2005 is VOID ab initio and must be disbanded for that purpose. Plaintiffs seek by this action: an accounting of the entire estate dating back to 1993 when GERALD contracted to convey his separate property interests to his blood children, a declaration of alter ego status o Mary Lundahl, and a constructive trust over the entire trust assets and distrubutions until such time thse issues may be decided by a jury.

### GENERAL FACTS

17.     GERALD LUNDAHL, the deceased was a general medical practitioner for nearly 60 years of his life until he died on August 10, 2015.

18.     Plaintiffs' mother was the first of five wives of GERALD LUNDAHL. GERALD was married to Ruth Marlene Telford (hereinafter referred to as MARLENE) for more then 26 years before GERALD divorced MARLENE to marry his high school sweetheart, Ruth Carlson.

19.     Plaintiff's mother supported GERALD LUNDAHL through his college years and through medical school. During their marriage, GERALD and MARLENE bore twelve (12) children. Both GERALD and MARLENE came from poor families and consequently had strong "work" ethics which they instilled in their twelve (12) children.

20.     Nothing was "given" to GERALD and MARLENE's children like one would expect from a household where the head was a doctor and the mother owned her own lingerie business. Rather the contrary, the weekdays days started at 4:00 a.m. with the children making the breakfast meals, doing the dishes, vacuuming and dusting the 5,600 square foot house located on a 7 acre avocado ranch in Los Angeles County, California; subsequently dispatching to church seminary every morning by 5:45 a.m.; from church seminary the children drove directly to school which ended at about 2:30 p.m.; the boys would subsequently take on "construction chores" after school and the girls would work at

MARLENE's lingerie business doing inventory (free of wages as credit towards their college education);  after work the children returned home to make the dinner meals, clean the dishes and the entire family would generally enjoy t.v. together or individually do  homework.  The children generally obtained high marks in school.  The weekends were always spent together doing some type of family activity or church activity.   On Sundays,  the family was generally at church all day long because GERALD and MARLENE usually were church instructors or in the bishopbric.

21.    Because  the older children did well  in school,  they obtained scholarships for their university studies at distant locations.  Any additional  living finances at the distant colleges (usually Brigham Young university in Utah) were funded through work credits the older children earned when working (wage free) for their mother's lingerie business, at the father's medical business, or the boys earned from their construction labors.

22.    During the latter part of the children's higher education,  MARLENE's lingerie business based on multi level selling, failed when the company overextended credit to it's distributors  for lingerie manufactured by MARLENE's company, and the distributors rather than paying their account receivables, pocketed the monies to enjoy their lavish lifestyles.  MARLENE was pregnant with GERALD's twelth (12th ) child,  and consequently stayed at home shortly after her lingerie business shut it doors.  Meanwhile, GERALD increased his medical practice business and was working longer hours to make up the difference in MARLENE's lost lingerie business.   All of the marital properties generated from  GERALD and MARLENE's wholly owned businesses were community properties having their genesis during the couple's marriage.   Moreover,  GERALD was an officer in MARLENE's lingerie business,  MARLENE designed and decorated GERALD's medical offices,  GERALD's older children, Brigham, Kimball, Heidi and Holli actually helped build and construct GERALD's medical offices during their summer reprieves and worked (free of wages in GERALD's medical practice to earn living expenses for their  continued university studies);  MARLENE managed the employment activities of GERALD's medical staff from the homesite and conducted other administrative functions;  and accordingly,  GERALD's medical practice thrived after  the lingerie business collapsed.

23.    While the older children were away at Brigham Young university during the fall and winter semesters and  while MARLENE   (pregnant with GERALD's twelth child)  was working a remote position from the couple's  ranch home,  GERALD's high school sweetheart

4

(now divorced from her husband and with 3 children) targeted GERALD, now a thriving doctor, to rekindle an old relationship. GERALD succumbed to this overt influence and began divorce proceedings against MARLENE who was adamantly opposed to any such disruption of their marital relations. GERALD successfully obtained a divorce decree from MARLENE sometime in 1983 – but their marital properties were never finally settled because GERALD consistently delayed assessment of the value of his thriving medical business. GERALD married his high school sweetheart shortly after the ink dried on his divorce decree from MARLENE.

24.   GERALD's second wife and three children moved into a home which GERALD purchased from the income of his "community property with MARLENE", his medical business. GERALD's name was on the title to his Orange County home. GERALD's second and subsequent wives would never work nor contribute to the income derived from GERALD's medical business, community property of both GERALD and MARLENE only.

25.   GERALD's subsequent wives would procure GERALD to sustain their lavish lifestyles because of his status as a thriving doctor; successful procurements because of GERALD's pathological need for sexual intimacy within the bounds of marriage based on GERALD's religious background. All of GERALD' wives, including the present wife MARY LUNDAHL, used this intimacy as a tool to sustain the marriages and their lifestyle of living without any labor or other contribution towards the feigned "marital res'" which in fact was not the community property of any of GERALD's subsequent wives.

26.   The older children's "income credits" earned for many years while GERALD and MARLENE were married, all of a sudden disappeared after GERALD married his second wife. The older children than took on multiple jobs and educational loans to sustain funding their ultimate health care provider doctoral degrees.

27.   In or about 1988, GERALD's child BRIGHAM personally constructed a medical, chiropractic, physical therapy and diet facility in Temecula California, after obtaining his doctoral degree. After constructing and initiating this practice, BRIGHAM invited GERALD to come into the practice as a medical diet doctor. GERALD joined BRIGHAM's Temecula practice under an agreement that GERALD's diet practice was the separate property of GERALD to be included in any inheritance that would go to GERALD's children upon GERALD's demise. GERALD also agreed that 50% of his lucrative income derived from GERALD's joined diet practice would be reserved to the benefit of GERALD's estate in favor

5

of his blood children and the other 50% of the income could go to GERALD's living expenses with his then wives.

28.    In the late 1980's, HOLLI graduated with a doctoral degree. HOLLI personally constructed and directed the opening of a medical, physical therapy and diet office in Moreno Valley, California. Again, HOLLI invited GERALD to come into the practice as a medical diet doctor. GERALD joined HOLLI's Moreno Valley practice under an agreement that GERALD's diet practice was the separate property of GERALD to be included in any inheritance that would go to GERALD's children upon GERALD's demise. GERALD also agreed that 50% of his lucrative income derived from GERALD's joined diet practice would be reserved to the benefit of GERALD's estate in favor of his blood children and the other 50% of the income could go to GERALD's living expenses with his then wives. HOLLI later opened up the same like facility in Lake Elsinore, California in 1990 which would close its doors in 1992 due to among other things, repeated theft of on site medical and diet drugs.

29.    GERALD's second wife RUTH was upset that GERALD was engaging in "separate property" business with his blood children to which RUTH could not claim as "community property"; although GERALD was exceedingly generous with his 50% take home income from his separate property "partnered diet businesses", constantly showering RUTH with gifts from his separate property income to which RUTH did not contribute in labor or otherwise. In 1990, this conflict and RUTH's inheritance of a multi million dollar estate from her uncle, led to the demise of GERALD and RUTH's 8 year marriage which was based on RUTH's monetary incentives from the outset.

30.    In 1991, GERALD moved to Temecula, California where he met a terminal care nurse, a patient from BRIGHAM's clinic in Temecula. Based on GERALD's foregoing need for sexual intimacy (only achieved through the bonds of marriage based on GERALD's religious beliefs), GERALD married this nurse named MARIANNE (dont recall last name) at a justice of the peace and moved her into his Temecula, California residence which was under an option to buy. GERALD informed MARIANNE that he would exercise the option to buy and purchase the Temecula home as their marital residence. While this transaction was pending escrow, GERALD learned that his third wife MARIANNE was a morphine addict and stealing morphine from her long term "in home care" patients which treatment was being subsidized by the state of California and that his third wife was pending investigation by the nursing board. GERALD believed these undisclosed facts were grounds to annul the

6

marriage and therefore did not complete the escrow of the sale of the Temecula residence. When GERALD returned to his Temecula residence from his work schedule at HOLLI's MORENO VALLEY office that day, MARIANNE was waiting at the Temecula residence with a gun in hand because GERALD did not close escrow on the Temecula home. MARIANNE dislodged a gunshot at GERALD, missing his head; GERALD quickly manuevered the gun out of MARIANNE's hand whereupon he dispatched the gun to the garage and locked same into the trunk of his car. While GERALD was wrestling the gun from MARIANNE's hands, HOLLI walked into the premises and witnessed the end result of the confrontation. The police showed up upon a complaint of gun shots, a report was made by GERALD and GERALD and HOLLI were directed to leave the premises to secure their safety, irrespective that MARIANNE was taken in custody for assault with a deadly weapon. GERALD immediately terminated this marriage through annulment. MARIANNE voluntarily vacated the Temecula residence and went to Las Vegas Nevada to avoid criminal prosecution both for the assault charge and for the theft of morphine from her long term patients. GERALD declined to act as a witness on the assault charge given MARIANNE asserted a defense of of temporary insanity and incapicity given MARIANNE was under the influence when she shot at GERALD. The state never proceeded on the assault charges but MARIANNE did lose her nursing license.

31. In the interim, MARLENE who obtained sole custody of the children moved to Utah where GERALD and MARLENE continued their battles over settlement of community property issues and GERALD's repeated failure to timely submit alimony and child support; the latter a condition urged by RUTH, GERALD's second wife. On March 10, 1993, MARLENE obtained a back alimony judgment against GERALD in the amount of $29, 450.00. See exhibit "1" attached. MARLENE recorded this lien against GERALD's diet practices in MORENO VALLEY and TEMECULA as Instrument no. 19930121836 on 3/18/1993, Abstract Judgment against LUNDAHL GERALD D, with the San Bernardino County Recorder's Office and sent law enforcement officers from the Family Services Department to GERALD's joined practices with BRIGHAM and HOLLI to collect on the judgment in April of 1993. GERALD quickly paid this judgment to avoid injury to his practices and his business partners BRIGHAM and HOLLI.

32 . Just before this judgment was served upon GERALD at the MORENO VALLEY office, MARLENE sent GERALD a certified letter complaining that she was losing her Utah

7

home based on the failure of GERALD to settle the community properties owned by the couple during their marriage and the need for these funds to pay off MARLENE's mortgage debt originally co-signed by MARLENE's father BRIGHAM TELFORD,  who was now deceased.   GERALD procured HOLLI out of the proceeds of HOLLI's businesses to make a mortgage payment to the bank to cover delinquents payments  up through December of 2003 -- while GERALD made arrangements to assess the value of his partnered interests in BRIGHAM and HOLLI's health care clinics and diet businesses,    to avoid further defamational injury from collection procedures  by MARLENE and possible criminal prosecution by the Department of Family services.

33.   While these assessment proceedings were going forward,  in late 1993, HOLLI joined GERALD and together opened additional  diet centers in Chino Hills and Orange  under an agreement that GERALD's  diet practice was the separate property of GERALD to be included in any inheritance that would go to GERALD's children upon GERALD's demise.   GERALD also agreed that 50% of his lucrative income derived from GERALD's  and HOLLI's  new diet practices would be reserved to the benefit of GERALD's estate in favor of his blood children and the other 50% of the income could go to GERALD's living expenses, either solo or with his projected wives.    GERALD and HOLLI employed GERALD's  daughter  and HOLLI's sister MARTI  to work the ORANGE county diet center, employed GERALD's  daughter and HOLLI's sister KELLI to run  the MORENO VALLEY office,  and HOLLI took over management of the CHINO HILLS office.

34.   KIMBALL, GERALD's son obtained  his doctoral degree to practice in California in early 1994.  KIMBALL  personally constructed a medical, chiropractic, physical therapy and diet facility in  Rancho Cucamonga California.    After constructing and initiating this practice,  KIMBALL  invited GERALD to come into the practice as a medical diet doctor.   GERALD joined   KIMBALL's Rancho Cucamonga   practice under an agreement that GERALD's diet practice was the separate property of GERALD to be included in any inheritance that would go to GERALD's children upon GERALD's demise.   GERALD also agreed that 50% of his lucrative income derived from GERALD's joined diet practice would be reserved to the benefit of GERALD's estate in favor of his blood children and the other 50% of the income could go to GERALD's living expenses, solo or with his prospective wives.  KIMBALL and GERALD then opened upon the Ontario and Laverne diet offices, using the staff employed by KIMBALL at his Rancho Cucamonga facilities.  Against it was agreed that

50% of GERALD's lucrative income derived from GERALD's joined diet practice would be reserved to the benefit of GERALD's "separate property" estate in favor of his blood children and the other 50% of the income could go to GERALD's living expenses, solo or with his prospective wives. By March of 1994, GERALD was the partnered owner of 7 diet offices with his children BRIGHAM, HOLLI and KIMBALL, all diet centers promised as assets and inheritances to the Telford-Lundahl Trust officially created on June 15, 1993 and specifically to GERALD's blood born children, also GERALD's partners in business.

35. In March of 1994, MARLENE wrote GERALD a letter again demanding her 50% property share of the Temecula and Moreno Valley businesses owned by BRIGHAM and HOLLI - based on MARLENE's assertion that these businesses were partly funded with the sale proceeds from GERALD's medical practice, an admitted community property asset during the marriage of GERALD and MARLENE. MARLENE also informed GERALD that her Utah home was under foreclosure and being sold at a foreclosure sale planned before April 4, 1994, and if GERALD did not settle part of their property estate by the time of the foreclosure sale, that MARLENE would sue GERALD for loss of her UTAH home. GERALD procured HOLLI to buy the Utah home from Olympus bank to save GERALD from further tort damages. HOLLI agreed to purchase the UTAH home as long as GERALD would sign a contract with HOLLI (a) donating GERALD's ownership interests, titles, and shares of all 7 diet offices, or from the sale proceeds thereof, to the Telford-Lundahl Trust, upon the death of GERALD; (b) that GERALD would set aside 50% of the net income after taxes from these 7 diet centers as liquid monetary assets to be donated to the Telford-Lundahl Trust upon the death of GERALD; (c) that GERALD utilize his best efforts during his lifetime to maximize the value of his estate to be donated to the Telford-Lundahl Trust upon the death of GERALD; (d) that GERALD was prohibited from wasteful dissipation of his assets to be donated to the Telford-Lundahl Trust upon the death of GERALD; (e) that GERALD was prohibited from making gifts during his lifetime from the assets to be donated to the Telford-Lundahl Trust without express and written approval of either trustee HOLLI or HEIDI, (f) that GERALD was restricted as to the manner in which he must manage or enjoy his assets to be donated to the Telford-Lundahl Trust upon GERALD's death, (g) should GERALD diminish, waste or gift his assets promised to the Telford-Lundahl Trust, that GERALD consented to anyone of GERALD's blood children to attaching GERALD's personal and business assets to satisfy the performance of GERALD's donative contract and (h) that

GERALD would purchase a life insurance policy in favor of his children sufficient to cover a present estate value of $11 million dollars.

36.    On March 9, 1994, GERALD entered into the foregoing "donative contract" / contract to inherit, and in return : (a) HOLLI purchased MARLENE's Utah Home to save it from foreclosure, see exhibit "2" attached; (b) GERALD's children BRIGHAM and JARED agreed to perform all maintenance and improvements on the home while MARLENE and/or any of her and GERALD's children were in possession; (c) BRIGHAM agreed to maintain any repairs on any vehicle ultilzed by MARLENE, (d) HOLLI and KELLI would pay for all utilities to the UTAH home during the duration of MARLENE's life; (e) HOLLI and HEIDI would pay all property taxes to the Utah property during MARLENE's lifetime; and (f) that HOLLI would secure any tort action from being brought against GERALD as related to MARLENE's residence on the UTAH property based on GERALD's failure to settle his marital estate with MARLENE in a timely manner.  AS A MATTER OF FACT AND LAW, ALL OF GERALD'S CHILDREN PERFORMED ON THE FOREGOING PROMISES WITHIN THEIR REASONABLE CONTROL. Full performance by Plaintiffs on the  "donative contract" / "contract to inherit ",  mandates  specific performance on this contract.   In addition,  this "donative contract" / "contract to inherit "  made GERALD's blood children creditors to GERALD  by the Debtor and Creditor Laws under a  Cal. Fam. Code § 852(b) and  28 U.S. Code § 3302 et. seq.

37.    In late 1994, GERALD met another diet patient by the name of LUCY. Within months, he married LUCY,  again before a justice of the peace in a private ceremony, LUCY kept her separate property while GERALD kept his separate property.   According to LUCY's wishes,  the parties lived in separate residences except for weekends at which time GERALD and LUCY would go to a hotel to consummate their marriage.   GERALD did not like this arrangement  because he felt he was on an appointment calender with LUCY.  After 10 months  of this arrangement,  GERALD and LUCY mutually decided to annul the marriage and go their separate ways.  Shortly thereafter,  in or about July of 1995,  GERALD met his present wife MARY ANN HADLEY.

38.    In the interim,  MARLENE obtained a property settlement judgment against GERALD in Utah for 50% of GERALD's  50%  interests in the Temecula and Moreno Valley diet centers, in the amount of  $672,300.00.   See exhibit "3" attached hereto for judgment entry on April 13, 1995.   MARLENE attempted  to record the judgment in the state of

California against GERALD's diet businesses but was frustrated in doing so.

39.    MARY ANN and GERALD  were married in December of 1995.  MARY ANN had only one separate property at the time she married GERALD in December of 1995, to wit: a heavily leveraged home located at  900 N. Acacia Ave. Fullerton, CA 92831 and now owned by her son after the death of GERALD,  Brian David Lawson Hadley.   Like all of GERALD's wives except  MARLENE,  MARY ANN did not work to contribute to the household income. The  household income generated solely from GERALD's "separate properties" income from the diet centers,    and in accordance with the   "donative contract" / "contract to inherit " executed by GERALD 1½ years earlier,  was  supposed to be limited to 50% of  GERALD's reported net income.      After GERALD married MARY ANN,   GERALD paid off all liens to MARY ANN's fullerton home leveraged at more than 50%.   Once GERALD used separate income property from the diet centers to pay off the liens to MARY ANN's   FULLERTON home,  Gerald converted the Fullerton home into community property. [1]

40.    Subsequently,  MARY ANN and GERALD purchased a home in Banning California with GERALD's supposedly separate 50% net  income earned from the Diet centers.    (Plaintiffs will be seeking an accounting to verify that only 50% of GERALD's net income was being used to purchase these homes.  Nevertheless,  because the purchase funds derived from GERALD's separate properties partnered with GERALD's blood children, the Banning home actually became a separate property of GERALD.    Title in the BANNING home was placed in MARY ANN's name to conceal this asset from collection of  MARLENE's $672,300.00 Judgment.  Title in the  Banning home was a fraudulent conveyance.

---

1.   See **Rosenthal v. Rosenthal, No. 20090. (Cal.App. 1st  Dist., 1963)** :
The applicable statute here is Civil Code section 163, which defines the husband's separate property: "All property owned by the husband before marriage. and that acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, is his separate property." The increase in value of the husband's inheritances here is equivalent to the "rents,  **[215 Cal. App. 2d 145]** issues and profits" referred to in Civil Code section 163.
        The funds to purchase the residence were traced directly to appellant's separate property. Title was taken in his name alone. The court does not find there was any special agreement between the parties to transmute this particular asset from separate property to community property.  Since the court does not find such an agreement to exist, an award of the residence to respondent cannot be sustained.

41. Thereafter, MARY ANN and GERALD sold the Banning home to move closer to MARY ANN's daughter in CHINO HILLS. The sale funds from the BANNING home (which actually constituted separate property of GERALD outside of the fraudulent conveyance) was used to purchase a home at 15456 Painter Dr., Chino Hills, CA 91709. Accordingly, that home became the separate property of GERALD as MARY ANN did not contribute whatsoever to the purchase funds of that home. Like the Banning home, the CHINO HILLS home continued to be titled in MARY ANN's name to avoid attachment by MARLENE. The property was in an unimproved condition. GERALD petitioned his sons BRIGHAM and JARED to improve the property by building a cabana and pool in the backyard, by designing and installing the outside land architecture to the home an by doing some inside remodeling. BY the time, BRIGHAM and GERALD had improved the home thinking that the home would become an asset of the Telford-Lundahl trust, the home had a valued worth of $713,777. See exhibit "4" attached hereto.

42. In May of 2003, MARLENE's 1995 property Judgment against GERALD had increased to $1.2 million dollars in the state of Utah. GERALD was ordered to appear on an order to show cause why he should not be found in criminal contempt for failure to pay this judgment. GERALD challenged the judgment on article III grounds representing both that Utah had no jurisdiction to enter a criminal contempt judgment against GERALD because the parties were divorced in California, and secondly, because GERALD had entered into a "donative contract" / "contract to inherit " with his children which donated all of the diet centers, or the sale proceeds thereof, and 50% of the income proceeds from those centers upon GERALD's death to the Telford – Lundahl Trust, of which MARLENE was a beneficiary, and because all of MARLENE's reasonable living needs were being provided for by GERALD and MARLENE's children in the interim, sufficient to MOOT any criminal or civil contempt judgment against GERALD. The UTAH judge agreed that the 1994 "donative contract" / "contract to inherit " constituted a property settlement with MARLENE and ruled that should GERALD breach this contract that the surviving members of the trust would have an action against GERALD. Accordingly in June of 2003, the $1.2 million judgment was discharged as provided for, in part, in the "donative contract" / "contract to inherit ". Consequently, no efforts were made to obtain a like judgment in California until the "donative contract" / "contract to inherit " was breached.

43.    Sometime in 2003, MARY ANN's daughter lost their carpet business. MARY ANN procured GERALD to purchase a home at 4180 Stone Mountain Dr, Chino Hills, CA 91709, again allegedly out of the proceeds of GERALD's 50% interests in his income from his diet centers, again separate property of GERALD.   GERALD did purchase a home at 4180 Stone Mountain Dr, Chino Hills, CA 91709  allegedly from his separate property proceeds which he allowed Kendra Hadley Walker to reside in free of rent.   That home is valued at $616,165. See exhibit "6" attached for  real estate value posted on realtor.com.   Because this property was purchased with  GERALD's separate property income and because the "donative contract" / "contract to inherit " with GERALD's blood children prevented granting any  gifts to either MARY ANN,  her children, or others  unless it met the terms of the "donative contract" / "contract to inherit ",   specifically a written approval  with HEIDI or HOLLI,  GERALD's conduct purchasing this property for rent free use of KENDRA violated Plaintiff's  contract.

44.    On April 17, 2005,  MARY ANN and GERALD created a revocable living trust. The first time Plaintiffs learned of this trust is when part of  GERALD's blood  children were mailed this trust on January 26, 2016, after GERALD's death.   The Trust document dis-inherents some of GERALD's children which is not consistent with the TELFORD-LUNDAHL trust;  shows sole distributions of the Fullerton residence valued at  $616,461 (See exhibit "7" attached)   to MARY ANN's son,  distribution of the Stone Mountain property valued at $616,165  to MARY ANN's daughter,  suggests without identifying that 50% of MARY ANN HADLEY's entire trust assets go to the daughter and  the other 50% of MARY ANN HADLEY's entire trust assets go to the son.    These distributions are fraudulent on their face because they do not provide an accounting of what the total trusts assets are  and whether they can meet the financial requirements of  "donative contract" / "contract to inherit " executed by GERALD first in time on  March 9, 1994.   It is charged that the trust is fraudulent on its face because it expressly conceals  assets to satisfy the creditor's contract entered into with GERALD in 1994.

45.  The trust document does not identify the disposition of the painter property. After some investigation it was discovered that the PIONEER home was sold under market for $650,000 on March 28, 2014.    Refer back to exhibit "4" attached.    The proceeds again deriving from the  separate property of GERALD  appeared to have been placed into the GERALD and MARY LUNDAHL  trust minus  a subsequent purchase of a mobile home unit

for approximately $42,000 on pipeline ave where MARY ANN purports to now reside.   The Trust document ends by stating that the "remainder trust proceeds, without any accounting, are to be equally distributed to MARY ANN's children and the children not disinhereited by GERALD.   The Trust document is fraudulent on it's face by virtue of the unequal distrubutions made to MARY ANN's children upon GERALD's death.   Futhermore, the trust refers to life insurance in an ambiguous manner,  insurance GERALD contracted to provide to cover the appraised $11 million value of the   "donative contract" / "contract to inherit " executed by GERALD on March 9, 1994.

46.   From 2008 to  the time of GERALD's death,   MARY ANN kept GERALD's children from communicating whatsoever with GERALD.   MARY ANN censored GERALD's children's multiple phone calls and attempted visits  to GERALD to commensurate  with their father and enjoy his company;   to check into his health and well being and to act accordingly if necessary;  to verify if  any unauthorized distributions concerning the TELFORD-LUNDAHL trust had taken place;  and for other purposes.   Suspiciously MARY ANN sought to cremate GERALD's body,  in express teaching of GERALD's faith and desire to be buried in his temple clothing.  In fact,  JARED had to legally intercede on this cremation request  to make sure the GERALD received the proper burial that he had long desired.   It is asserted that MARY ANN exercised undue influence over GERALD the last 7 years of his life so as to tortiously intefere with  Plaintiff's inheritance  documented by the "donative contract" / "contract to inherit " executed by GERALD on March 9, 1994;  did in fact  engage in fraudulent conveyances when she put title in all of the residences in her name for the express purpose of evading the judgments of MARLENE,  that MARY ANN may have converted other assets of the Telford-Lundahl Trust and accordingly Plaintiffs are entitled to a constructive trust over the entire trust and the distributions made therefrom.

## COUNT ONE
## ACCOUNTING

47.   Plaintiff  realleges those allegations contained in paragraphs 1 through 46 of this Complaint.

48.   Defendants  have  usurped  the exclusive  control  of  the GERALD and MARY ANN LUNDAHL  revocable  living  trust  as well  as  the  trust's   books,  records  and  other documents. The Court should order Defendants  to account for all activities, moneys and

assets of  GERALD and MARY ANN LUNDAHL revocable living trust  and to return all funds and/or assets to the trust  for distribution according the   "donative contract" / "contract to inherit " executed by GERALD on March 9, 1994.

## COUNT  TWO
## CONSTRUCTIVE TRUST

49.    The trustee is the person so empowered, and may sue on behalf of the trust to accomplish the purposes of the trust or otherwise protect the property held in trust. NRS §§ 163.023, 163.4147. "As a general proposition, the creation of a trust divides title to the trust property, placing legal title in the trustee and equitable title in the beneficiary." 76 AM.JUR. 2d Trusts § 258 (2010), cited in Goodrich v. Briones (In re Schwarzkopf), 626 F.3d 1032, 1039 (9th Cir. 2010). In federal court, a trustee of an express trust may sue in her own name without joining the trust on whose behalf the action is brought. F.R. CIV. P. 17(a)(1)(E).   "A constructive trust is an involuntary **equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner.**" Communist Party of the U.S. v. 522 Valencia, Inc., 35 Cal. App. 4th 980, 990 (1995); see also Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 908-09 (9th Cir. 2010) (citing 522 Valencia). "The principal circumstances where constructive trusts are imposed are set forth in Civil Code sections 2223 and 2224." 522 Valencia, 35 Cal. App. 4th at 990. Section 2223 states, "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Similarly, section 2224 states, "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

50.    Plaintiffs allege that MARY ANN is an involuntary trustee over the assets belonging to the Telford-Lundahl Trust.   Plaintiffs thereby seek an order creating a constructive trust over the GERALD and MARY LUNDAHL trust dated 2005 until such time true ownerships of these assets can be made.

## COUNT THREE
## BREACH OF FIDUCIARY DUTY

51.    Plaintiff realleges those allegations contained in paragraphs 1 through 50 of

this Complaint

52.     Defendant MARY ANN  has breached the fiduciary duty of a trustee,  to fully notice  the  beneficiaries  of  the  trust  to  the  trust  assets  and  to  distribute  those  assets  in compliance with the law so as not to avoid creditors,  a position which Plaintiffs occupy.

53.     Defendant  MARY ANN's  breach of the fiduciary duty owed Plaintiffs  has caused  Plaintiffs to suffer damages and harm in the amount of $11 million or more plus interest dating back to March 9, 1994 at the rate of 10%.

54.     Defendant  MARY ANN's   conduct  has  been and continues to be wilful, wanton, and malicious, and entitles Plaintiffs  to punitive damages to prevent this Defendant, and others similarly situated, from engaging in similar conduct in the future.

## COUNT FOUR
## UNJUST ENRICHMENT

55.    Plaintiffs reallege those allegations contained in paragraphs 1 through 54 of this Complaint.

56.    The Defendants will be unjustly enriched if they are allowed to retain the profits realized from the diet businesses donated to the Telford –Lundahl trust in 1994 and for the value  of  the  distributed  real  properties  obtained  off  the  separate  income  properties  of GERALD,  until Plaintiffs can verify enough assets in the trust to satisfy Plaintiff's  "donative contract" / "contract to inherit " executed by GERALD on March 9, 1994.  Accordingly, Plaintiffs against seek a constructive trust on all of those assets until Plaintiffs clais have been fairly and fully heard.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH EXPECTED INHERITANCE

57.    California recognizes a cause of action for tortious interference with expected inheritance in     **Beckwith v. Dahl (2012) 205 Cal.App.4th 1039.**  Pursuant to Plaintiff's  to the forum clause and conflicts of law rules in  the  "donative contract" / "contract to inherit " executed by GERALD on March 9, 1994,  Plaintiffs  are entitled to invoke California's theory of recovery for tortious interference with expected inheritance.

58.    Plaintiffs  have  pled  an  expectancy  of  inheritances  from  GERALD,  by written and oral contracts.  It is not necessary for plaintiffs to allege that "one is in fact named

as a beneficiary in the will **or that one has been devised the particular property at issue** as this would defeat the purpose of an expectancy claim.

59.    Plaintiffs  have  also  provided  proof amounting to a reasonable degree of certainty **that the bequest or devise would have been in effect at the time of the death of the testator . . . if there had been no such interference."**    Plaintiffs alleged that the interferences with their expected inheritances were prima facie shown from the outset when MARY ANN repeatedly procured titles to real estate properties in her name by using the separate property income funds of GERALD and the Telford-Lundahl trust to obtain these real estate properties  and then by avoiding collection procedures against the properties which bore her name as separate properties and not the name of GERALD as the contracted or judgment party. .  In addition,  MARY ANN has represented in the presented trust instrument that the real estate holdings were gifts of GERALD,   in direct contravention of the   "donative contract" / "contract to inherit " executed by GERALD on March 9, 1994  and which required the written consent of either HOLLI or HEIDI as the trustees to the Telford-Lundahl Trust  to issue any gift out of GERALD's estate while GERALD was living.  Accordingly,  MARY ANN's fraudulent conveyance or wrongful conversion conduct  is tortious  for  reasons other than the fact of the interference itself.

60.    Finally,  by not producing the Life Insurance of GERALD which was supposed to indemnify the Plaintiffs against any losses to  the $11 million value of the  trust res as it existed in 1994,  MARY ANN has  damaged  the Plaintiffs to this monetary amount plus interest.  Plaintiffs are also entitled to all special and punitive  damages as allowed by law for a concerted effort to defeat the inheritances rights of those disinherited by the GERALD and MARY LUNDAHL living trust dated 2005.

## COUNT SIX
## WRONGFUL CONVERSION

61.    Plaintiffs re-allege  those allegations contained in paragraphs 1 through 60 of this Complaint.

62.    Defendants  committed  the  tort  of conversion by transferring properties for their own personal use – without any proven  authority to do so that was in compliance with the   "donative contract" / "contract to inherit " executed by GERALD on March 9, 1994.

63.    Defendants  wrongful conduct,  as  herein alleged, has caused  Plaintiffs to

suffer damages in the amount of $11 million plus interest dating back to 1994, and justifies the imposition of a constructive trust on all of such property which was wrongfully converted together with an award of such other damages as the Plaintiffs suffered as a consequence of the wrongful conduct.

64.    The Defendants conduct has been and continues to be wilful, wanton, malicious and in total disregard for the rights and property of others. Defendants conduct is so egregious as to entitle Plaintiffs to an award of punitive damages to prevent this Defendants, and others similarly situated, from engaging in similar conduct in the future.

## COUNT SEVEN
## BREACH OF CONTRACT AND BAD FAITH BREACH

65.    Plaintiffs re-allege those allegations contained in paragraphs 1 through 64 of this Complaint.

66.    Defendants have breached the terms of the "donative contract" / "contract to inherit " executed by GERALD on March 9, 1994. Defendant in is agency with GERA_D for that breach in light of the status carried by MARY ANN as "OUR TRUSTEE".

67.    Defendants by nook and crook and bad faitth have tried to avoid any liabilities arising from the breaches by claiming substantial gifts that GERALD purportedly awarded to children who were not his own. Not only did these conveyances cloaked as gifts. violate the terms of "donative contract" / "contract to inherit " executed by GERA'_D on March 9, 1994, they were suspect at best because absolutely no consideration was granted for the substantial gifts to children not copulated by GERALD.

68.    Plaintiffs contend that the breaches were committed in bad faith and entitle the plaintiffs to mental distress damages that normally attach to the Defendant's bad faith conduct.

## PRAYER

WHEREFORE Plaintiffs prays for the following:

1.    For All compensatory, general, special and punitive damages allowed by law;

2.    For equitable relief by a decree of unjust enrichment and imposition of constructive trust.

3.    For a decree ordering an accounting of all assets involved in the trust dating back to 1994 and for an order restricting defendants from destroying any of these records.

4.   For an order directing the production of GERALD's tax returns dating back to 1994;

5.   For an order directing the trust to produce all of GERALD's life insurance policies dating back to 1994.

6.   For all pre and post judgment interest as allowed by contract and by law;

7.   For attorneys fees and court costs as allowed by law; and

8.   For trial by jury.

Dated:  March 19, 2016

HEIDI  BELL

JARED LUNDAHL

LOGAN LUNDAHL

BRIGHAM LUNDAHL

H.  T.  LUNDAHL

TELFORD – LUNDAHL TRUST
Trustee- Heidi Bell
on behalf of all other trust
beneficiaries otherwise not scribed

1

03/18/2003  11:28    4076531063                    FLASH MAIL                    PAGE  08/21

CASE NUMBER 784449259 Divorce/Annulment                    **** PRIVATE ****

```
              in Third floor, Rm 302 with Judge MAETANI.              convert
02-08-93 Note: *MINUTE ENTRY  CONTINUED                              aliced
02-22-93 Order to Show Cause scheduled on February 23, 1993 at 09:01 AM
              in Third floor, Rm 302 with Judge MAETANI.              aliced
02-24-93 Note: *PLAINTIFF'S ADDRESS                                  aliced
02-24-93 Note: *MINUTE ENTRY  ***CERTIFIED TO JUDGE BURNINGHAM***    aliced
03-04-93 Note: *FAX COPY OF MOTION FOR OBJECTION TO RECOMMENDATION OF karenj
03-04-93 Note:    COMMISSIONER MAETANI                               karenj
03-04-93 Note: *FAX COPY OF MEMO IN SUPPORT OF OBJECTION             karenj
03-10-93 Note: *PRETRIAL ORDER                                      leilanip
03-10-93 Note: *MEMORANDUM IN OPPOSITION TO PLAINTIFF'S OBJECTION TO leilanip
03-10-93 Note:    COMMISSIONER'S ORDER                               leilanip
03-10-93 Note: ****** JUDGMENT 2:30 PM ******                       leilanip
03-10-93 Note:    MICROFILMED                                       leilanip
03-10-93 Note:    MICROFILMED 031193                                leilanip
03-10-93 Note: CREDITOR: RUTH M LUNDAHL                             leilanip
03-10-93 Note: DEBTOR:  GERALD D LUNDAHL
              29450.00                                               leilanip
04-09-93 Note: *REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR lonnam
04-09-93 Note: OBJECTION TO RECOMMENDATION OF COMMISSIONER MAETANI   lonnam
04-13-93 Fee Account created       Total Due:        5.00           convert
04-13-93 MISCELLANEOUS FEE       Payment Received:        5.00       sharonj
              Note: CERTIFIED COPIES
05-04-93 Note: *APPEARANCE OF COUNSEL (ATTY BURROWS FOR PLA)        sharonj
05-07-93 Note: *NOTICE OF RECORDS DEPOSITION (2)                    sharonj
05-07-93 Note: *CERTIFICATE OF MAILING OF INTERROGATORIES AND REQUEST
              FOR                                                    sharonj
05-07-93 Note: PRODUCTION OF DOCUMENTS                              sharonj
05-14-93 Note: *SUBPOENA DUCES TECUM ON RETURN                      sharonj
06-08-93 Note: *MOTION FOR CONTINUANCE (FROM 7/29 TO NEXT AVAIL DATE) sharonj
06-15-93 Pretrial Conference scheduled on August 10, 1993 at 08:30 AM in
              Fourth floor, Rm 402 with Judge BURNINGHAM.           zolad
06-16-93 Note: *CERTIFICATE OF SERVICE                              karenj
06-16-93 Note: *DEF'S OBJ TO CERTAIN INTTEROGATORIES AND REQ FOR PROD.
              OF DOCS                                                karenj
07-27-93 Note: *FINANCIAL DECLARATION                              natalieh
07-27-93 Note: *CERTIFICATE OF SERVICE                             natalieh
07-28-93 Note: *FINANCIAL DECLARATION                              natalieh
07-28-93 Note: *CERTIFICATE OF MAILING                             natalieh
```

2

When recorded mail to:
Olympus Bank, a Federal Savings Bank
P.O. Box 45035
Salt Lake City, Utah  84145-0035
Mortgage Loans Attn:  Charles H. Madsen

ENT 90183 BK 3576 PG 405
NINA B REID UTAH CO RECORDER BY MB
1994 NOV 28 11:40 AM FEE  10.00
RECORDED FOR HOLLI TELFORD LUNDAHL
M → 9373 Wilshire Blvd
Beverly Hills Ca
90210

## ASSIGNMENT OF TRUST DEED

**FOR VALUABLE CONSIDERATION**, the receipt of which is hereby acknowledged, **Olympus Bank a Federal Savings Bank**, formerly known as Prudential Federal Savings and Loan Association, hereby assigns to

HOLLI TELFORD LUNDAHL

that certain Trust Deed, together with the indebtedness secured thereby, which Trust Deed is dated October 19, 1978 was executed by
MARLENE T. LUNDAHL, A WOMAN

as Trustor, to
PRUDENTIAL FEDERAL SAVINGS AND LOAN ASSOCIATION, NOW KNOWN AS
OLYMPUS BANK, AFSB

, as Trustee

was recorded on __October 20, 1978__ , in Book __1690__
at Page____849-852____Entry Number__42513_____of the
records of the County Recorder of   UTAH   County State of Utah, and
covers real property situated in said county described as follows:

LOT 71, PLAT "B", SHERWOOD HILLS SUBDIVISION, PROVO, UTAH,
AS RECORDED ON THE OFFICIAL PLAT IN THE OFFICE OF THE RECORDER,
UTAH COUNTY, UTAH.

**Olympus Bank, a Federal Savings Bank,**
formerly known as Prudential Federal
Savings and Loan Association

By _Charles H. Madsen_
Charles H. Madsen

Dated__March 4, 1994__          Its     Vice President

STATE OF   UTAH        )
COUNTY OF   SALT LAKE  )

On __March 4, 1994__, personally appeared before me _Charles  H. Madsen_ who being
by me duly sworn, did say that he is the __Vice President_____of **Olympus
Bank, a Federal Savings Bank**, formerly known as Prudential Federal Savings
and Loan Association and that the foregoing instrument was signed in behalf
of said corporation by authority of a resolution of its Board of Directors,
and said____Charles H. Madsen_____acknowledged to me that said
corporation executed the same.



NOTARY PUBLIC
ELAINE WINN
115 South Main St.
Salt Lake City, Utah 84111
My Commission Expires:
April 21, 1995
STATE OF UTAH

My Commission Expires:__4-21-95__
Residing at:_Salt Lake City, Utah_

3

CASE NUMBER 784449259 Divorce/Annulment                    **** PRIVATE ****

---

12-01-94 Pretrial Conference scheduled on December 01, 1994 at 08:30 AM
         in Fourth floor, Rm 402 with Judge BURNINGHAM.              convert
12-01-94 Note: *ORDER (PLTS MOTION TO SET ASIDE ORDER GRANTED)       zolad
12-01-94 Note: *MINUTE ENTRY                                         zolad
01-03-95 Note: *WITHDRAWAL OF COUNSEL (ATTY BURROWS FOR PLA)         sharonj
01-23-95 HEARING ON PETITION scheduled on January 27, 1995 at 11:00 AM
         in Fourth floor, Rm 402 with Judge BURNINGHAM.              zolad
01-27-95 Note: *MINUTE ENTRY-JUDGMENT GRANTED                       zolad
04-13-95 Note: *****FINDINGS OF FACT, ORDER MODIFYING DECREE AND     loriw
04-13-95 Note:     JUDGMENT  10:25 AM *****                          loriw
04-13-95 Note:     (MICROFILMED  4-14-95)                            loriw
04-13-95 Note:  CREDITOR;  RUTH M LUNDAHL                            loriw
04-13-95 Note:     DEBTOR:  GERALD D LUNDAHL
              672300.00                                              loriw
04-30-96 Note: *LETTER FROM MRS. LUNDAHL & PACKET OF LETTERS         zolad
02-12-97 Note: FILED:  NOTICE OF WITHDRAWAL OF COUNSEL (MICHAEL ESPLIN) reedr
03-28-97 Note: FILED:  NOTICE OF RECORDS DEPOSITION                  reedr
05-29-98 Note: *****CASE IS ASSIGNED TO DIVISION 8*****             llonac
06-01-98 Judge DONALD J EYRE assigned.                              llonac
06-15-98 Issued: Order to Show Cause                                teria
              Judge DONALD J EYRE
              Hearing Date: August 13, 1998     Time:  09:00
06-15-98 **** PRIVATE **** Filed: Affidavit of Defendant            teria
08-04-98 **** PRIVATE **** Filed return: Order to Show Cause        jennifxr
              Party Served: LUNDAHL, GERALD D
              Service Type: Personal
              Service Date: July 28, 1998
08-14-98 **** PRIVATE **** Filed: Notice of Continuance of Order to Show
                        Cause                                       debbiej
08-20-98 ORDER TO SHOW CAUSE scheduled on September 22, 1998 at 09:00 AM
         in Second Floor, Rm 201 with Judge EYRE.                   debbiej
09-22-98 Minute Entry - Minutes for Order to Show Cause             leilanip
         Judge:  DONALD J. EYRE
         Clerk:  leilanip
         PRESENT
         Defendant's Attorney(s): MICHAEL D ESPLIN
         Audio
         Tape Number:     988145   Tape Count: 2579-3163

4

3/20/2016     15456 Painter Dr, Chino Hills, CA 91709 | Zillow



**CORRECT HOME FACTS**  ♡ **SAVE**  **GET UPDATES**  **SHARE**  **MORE** ▾     City, State, or Zip 🔍

California · Chino Hills · 91709 · 15456 Painter Dr





# 15456 Painter Dr,
Chino Hills, CA 91709

## 4 beds · 2 baths · ✏ sqft

✏ Edit

Edit home facts for a more accurate Zestimate.

**SOLD:**
**$650,000**

Sold on 03/28/14

Zestimate®:
**$713,777**

Update my Zestimate

Est. Refi Payment
**$2,266/mo**

🖩 ▾
**See current rates**

## CONTACT A LOCAL AGENT



☑ | **Christian Fuentes** | PREMIER AGENT
★★★★★ (21)
36  Recent sales
(909) 764-3141

**JC Kung** | PREMIER AGENT
★★★★★ (11)
5  Recent sales
(909) 344-5790

**Erika Shinzato** | PREMIER AGENT
★★★★★ (24)
17  Recent sales
(909) 527-2934

👤 Your Name

📞 Phone

✉ Email

I would like advice about selling a home similar to 15456 Painter Dr, Chino Hills, CA 91709.

Contact Agent

Learn how to appear as the agent above

See Zestimate updates, plus the latest sales and listings in your area.

Sign

# Buy dermal fillers online

50%

free shipping
EXPRESS

This 1634 square foot single

 

family home has 4 bedrooms and 2.0 bathrooms. It is located at 15456 Painter Dr Chino Hills, California. This home is in the Chino Valley Unified School District. The nearest schools are TOWNSEND and CHINO HILL HIGH.

## FACTS

- Lot: 0.44 acres
- Single Family
- Built in 1984
- All time views: 670
- Cooling: Central
- Heating: Forced air
- Last sold: Mar 2014 for $650,000
- Last sale price/sqft: $398

## FEATURES

- Ceiling Fan
- Double Pane/Storm Windows
- Fireplace
- Flooring: Tile, Other
- Garden
- Lawn
- Parking: Garage - Attached, 2 spaces, 460 sqft
- Pool
- Vaulted Ceiling
- View: City
- Verizon Fios Available

More ⌄          County website     See data sources

ACQUAFILLER

### Similar Homes for Sale

5643 Avenida De Portugal, Chino Hills,

**FOR SALE**
$797,810
4 beds, 3.0 baths, 2697 s...
5643 Avenida De Portuga...

5624 Costa Dr, Chino Hills, CA

**FOR SALE**
$883,145
4 beds, 3.0 baths, 2697 s...
5624 Costa Dr, Chino Hill...

17066 Lagos Dr, Chino Hills, CA

**FOR SALE**
$862,645
4 beds, 4.0 baths, 3098 s...
17066 Lagos Dr, Chino Hi...

16309 Domani Ter, Chino Hills,

**FOR SALE**
$799,999
Studio, -- baths, -- sqft
16309 Domani Ter, Chino..

See listings near 15456 Painter Dr

African American Wigs
Extra 10% Off
Shop Now
WIGSBUY


## Zestimate Details

Add owner estimate

Zestimate ❓     Rent Zestimate     Zestimate

$713,777 ❓        🏠  To see Zestimate forecast      SOLD: $620,000

3/20/2016                                    15456 Painter Dr, Chino Hills, CA 91709 | Zillow



Last   $5,    ⬆   Create a free account

30 days

$678K    $749K        0
                      One year
Zestimate range   $2.9K    $4K

                  Zestimate range

Zestimate ▾            1 year  5 years  10 years

— This home
-- 91709
···· Chino Hills

Dec 2007        Dec 2009        Dec 2011

SOLD: $620,000
Sold on 6/30/2015
3 beds, 2.5 baths, 1892 sqft
3109 Wildwood Ct, Chino Hills, CA 91709

### SOLD: $625,000
Sold on 6/3/2015
3 beds, 2.0 baths, 2037 sqft
3417 Altura Ave, Chino Hills, CA 91709

### SOLD: $650,000
Sold on 10/7/2015
3 beds, 2.0 baths, 1735 sqft
3542 Glen Ridge Dr, Chino Hills, CA 91709

### SOLD: $650,000
Sold on 2/29/2016
4 beds, 3.0 baths, 1885 sqft
3087 Spyglass Ct, Chino Hills, CA 91709

See sales similar to 15456 Painter Dr

## Featured Partners

**Equifax® Official Site**
Equifax.com/CreditReport
See Your Equifax® Credit Score. $1
When You Sign Up For 7 Day Trial

**Are you pre-approved yet?**
Zillow.com/pre-approval
Be ready to buy with a pre-approval
letter from a local lender.

3/20/2016                                        15456 Painter Dr - Google Maps

15456 Painter Dr



Imagery ©2016 Google, Map data ©2016 Google     20 ft

Google Maps

5

CASE NUMBER 784449259 Divorce/Annulment            **** PRIVATE ****

---

HEARING

Mr. Esplin addressed the Court.

Kelly Lundahl, Petitioner's daughter, addressed the Court.

The Court awarded judgment as prayed for plus attorney's fees and costs.

| Date | Description | | | |
|------|-------------|---|---|---|
| 09-22-98 | **** PRIVATE **** Filed: Letter- Gerald D Lundahl | | | leilanip |
| 09-23-98 | **** PRIVATE **** Filed: Tape Request Submitted | | | jennifxr |
| 10-14-98 | Fee Account created | Total Due: | 5.00 | jennifxr |
| 10-14-98 | Fee Account created | Total Due: | 1.50 | jennifxr |
| 10-14-98 | AUDIO TAPE COPY | Payment Received: | 5.00 | jennifxr |
| 10-14-98 | COPY FEE | Payment Received: | 1.50 | jennifxr |
| 10-14-98 | **** PRIVATE **** Filed: Tape Request Completed | | | chrisj |
| 04-28-99 | Filed judgment: Order and Judgment | | | carissal |

Judge GUY R. BURNINGHAM

Signed April 28, 1999

| | | | | |
|---|---|---|---|---|
| 04-28-99 | Judgment #2 Entered $ 63491.72 | | | carissal |

Debtor:   GERALD D LUNDAHL

Creditor: RUTH M LUNDAHL

62,991.72 Alimony

500.00 Attorneys Fees

63,491.72 Judgment Grand Total

| Date | Description | | | |
|------|-------------|---|---|---|
| 11-22-99 | Fee Account created | Total Due: | 1.75 | heatherp |
| 11-22-99 | COPY FEE | Payment Received: | 1.75 | heatherp |
| 05-05-00 | Fee Account created | Total Due: | 2.00 | crystals |
| 05-05-00 | Fee Account created | Total Due: | 2.00 | crystals |
| 05-05-00 | CERTIFIED COPIES | Payment Received: | 2.00 | crystals |
| 05-05-00 | CERTIFICATION | Payment Received: | 2.00 | crystals |
| 05-16-00 | Fee Account created | Total Due: | 4.00 | sherylc |
| 05-16-00 | Fee Account created | Total Due: | 12.00 | sherylc |
| 05-16-00 | Fee Account created | Total Due: | 6.00 | sherylc |
| 05-16-00 | CERTIFIED COPIES | Payment Received: | 4.00 | sherylc |
| 05-16-00 | COPY FEE | Payment Received: | 12.00 | sherylc |
| 05-16-00 | CERTIFICATION | Payment Received: | 6.00 | sherylc |
| 02-07-02 | Note: Video Tape Request Submitted By Marlene Telford (Lundahl | | | tennw |
| 02-08-02 | Fee Account created | Total Due: | 11.00 | tennw |
| 02-08-02 | COPY FEE | Payment Received: | 11.00 | tennw |

6

Log In

BUY

RENT

MORTGAGE

Find REALTORS®

LOCAL

NEWS & ADVICE

‹ Back to search

‹ Prev Next ›

Off Market

## 4180 Stone Mountain Dr Chino Hills, CA 91709

Est. $616,165 ⓘ

**4** beds  ·  **3** baths  ·  **2,404** sq ft



Google                                    ©2016 Google

Get Up To 4 Free Moving Quotes »

☑ Share

## Property Details

### Overview

The median price for this area is 730000. The 3 assigned schools for this property are located in Chino Valley Unified School District. There are currently 2,398 similar properties for sale within 10-mile radius, ranging from $396,800 - $1,298,000.

◆ Description

### Key Facts

- Single family
- Year built: 1998
- Price/Sq Ft: $256

### Schools

10 Michael G. Wickman Elementary School
9 Robert O. Townsend Junior High School
9 Chino Hills High School

### Public Records

- Beds: 4
- Rooms: 7
- House size: 2,404 sq ft
- Stories: 2
- Lot size: 6,100 sq ft
- Garage: Attached Garage
- Heating: Central
- Cooling: Refrigerator
- Construction: Wood Frame
- Year built: 1998
- Year renovated: 1998
- Property type: Single family
- Style: Modern
- Date updated: 01/13/2016
- Units: 1

## Schools & Neighborhood

### Schools

Assigned Schools                                                                            ∧

Score*            School

7



California · Fullerton · 92831 · 900 N Acacia Ave

# 900 N Acacia Ave, Fullerton, CA 92831

**OFF MARKET**

Zestimate®:

## $616,461

Update my Zestimate

Rent Zestimate®:
$2,650/mo

### 3 beds · 2 baths ·

✏ Edit  **sqft**

Edit home facts for a more accurate Zestimate.



See Zestimate updates, plus the latest sales and listings in your area.

Sign up

This 1374 square foot single

## GET A PROFESSIONAL ESTIMATE



**Bernadette Smith**      PREMIER AGENT
★★★★★ (10)
16  Recent sales
(714) 880-8474

**John Kohaut**      PREMIER AGENT
★★★★★ (27)
15  Recent sales
(714) 248-0591

**Wally Elsherif**      PREMIER AGENT
★★★★☆ (29)
20  Recent sales
(909) 572-8356

👤 Your Name

📞 Phone

✉ Email

I own this home and would like a professional estimate at 900 N Acacia Ave, Fullerton, CA 92831.

Contact Agent

Learn how to appear as the agent above

3 new neighborhoods
GRAND

3/20/2016                                          900 N Acacia Ave, Fullerton, CA 92831 | Zillow

family home has 3 bedrooms and
2.0 bathrooms. It is located at 900
N Acacia Ave Fullerton, California.

**FACTS**

- Lot: 7,687
  sqft
- All time
  views: 101

**FEATURES**

- Parking:
  405 sqft

More ⌄          County website    See data sources


OPENING MARCH 19TH!
From the $500Ks
to over $1 Million

*Learn more>>*

✿ IRVINE PACIFIC®

# Zestimate Details

Add owner estimate

| Zestimate ❓ | Rent Zestimate ❓ |
|---|---|
| **$616,461** | **$2,650/mo** |
| +$12,759 Last 30 days | +$58 Last 30 days |
| $586K          $647K | $2.4K          $2.9K |
| Zestimate range | Zestimate range |

Zestimate ▾          1 year  5 years  10 years

— This home  --
  92831

**Similar Homes for Sale**

| 1409 Alto Ln, Fullerton, CA 92831 | **FOR SALE**
$950,000
3 beds, 2.0 baths, 2359 s...
1409 Alto Ln, Fullerton, C... |

See listings near 900 N Acacia Ave

# GET THESE HOT TECH DEALS
& upgrade for less






CORR    HOM  FACTS    ♡ SAVE    GET UPDATES    SHARE    MORE ▾          City, State, or Zip 🔍

**Nearby Similar Sales**

3/20/2016                                 900 N Acacia Ave, Fullerton, CA 92831 | Zillow

Dec 2007          Dec 2009          Dec 2

# Price This Home

## Homes like this sold for $550-670K.



$480K                                    $740K



**PRICE THIS HOME**

Choose your own
comparables to figure
out a good selling
price.

Choose comps

# Improve This Home's Value

The right home project can make a significant impact
to your home value! Compare average project costs in
your area with estimated increases to your home
value. ❓

## Minor Kitchen Remodel

**SOLD: $550,000**
Sold on 10/21/2015
3 beds, 2.0 baths, 1441 sqft
1006 Oakdale Ave, Fullerton, CA 92831

**SOLD: $563,000**
Sold on 9/11/2015
3 beds, 2.0 baths, 1483 sqft
1607 Victoria Dr, Fullerton, CA 92831

**SOLD: $575,000**
Sold on 4/9/2015
3 beds, 2.0 baths, 1374 sqft
907 N Mountain View Pl, Fullerton, CA 92831

**SOLD: $575,000**
Sold on 7/15/2015
4 beds, 2.0 baths, 1417 sqft
824 N Acacia Ave, Fullerton, CA 92831

**SOLD: $580,000**
Sold on 6/18/2015
3 beds, 2.0 baths, 1190 sqft
1613 Riverside Dr, Fullerton, CA 92831

See sales similar to 900 N Acacia Ave

## Featured Partners

**Get Zillow to go.**
www.zillow.com/mobile
It's like take-out, only free.
Download the mobile app today!

**Are you pre-approved yet?**
Zillow.com/pre-approval
Be ready to buy with a pre-approval
letter from a local lender.



wigsbuy

Human Hair Wigs

95% Off



### Minor Kitchen Remodel

Project cost: $21,497

See kitchen ideas

### Deck Addition





### Deck Addition

+ 1 ... ALUE
Project cost: $11,685

See deck ideas

# Price / Tax History

Price History      Tax History

# Sell Your Home



**$587,000  Warm**

9.4%

Past 12
months

| Buyers' | Sellers' | | United |
| Market | Market | | States |

Zillow predicts 92831 home values will increase 1.6%
next year, compared to a 2.2% increase for Fullerton
as a whole. Among 92831 homes, this home is valued
5% more than the midpoint (median) home, and is
valued 22.1% more per square foot.

**NEARBY**

Homes      Map



‹                                                                    ›

Refinance

## Refinance

Mortgage payment breakdown for the home price of $616,461



| Percent down: |
| --- |
| 20% ($123, |

| Program: ❓ |
| --- |
| 30yr fixed : |

| Credit Score: |
| --- |
| 760 and ab |

**ESTIMATED PAYMENT**  **$3,082**

🔘 Principal & Interest    $2,218

🔘 Taxes    $616

⚪ Homeowners Insurance    $67

🔘 Mortgage Insurance    $181

See personalized rates

Sign Up $1 Trial: Equifax Credit Score

# Home Expenses

# Nearby Schools in Fullerton

| SCHOOL RATING | | GRADES | DISTANCE |
| --- | --- | --- | --- |
| 10 out of 10 | Acacia Elementary (assigned) | K-6 | 0.2 mi |
| 6 | Ladera Vista Junior | 7-8 | 0.4 mi |

3/20/2016                          900 N Acacia Ave, Fullerton, CA 92831 | Zillow



Ladera Vista Junior                7-8      0.4 mi
High (assigned)

out of 10

1 0      Troy High (assigned)        8-12     0.4 mi

out of 10

Data by GreatSchools.org ❓

More schools in Fullerton

---

# Get a Professional Estimate



**Bernadette Smith**
PREMIER AGENT
★★· (10)
16 Recent sales
(714) 880-8474

**John Kohaut**
PREMIER AGENT
★★· (27)
15 Recent sales
(714) 248-0591

**Wally Elsherif**
PREMIER AGENT
▪ ▪ (29)

Recent sales
(909) 572-8356

👤 Your Name

📞 Phone

✉ Email

I own this home and would like a professional estimate at

Contact Agent

Learn how to appear as the agent above

## Ask these lenders about financing ❓

 **World Mo**
(714) 569-...
NMLS

 **Adrian En**
(626) 391-...
NMLS



| NEARBY CITIES | NEARBY NEIGHBORHOODS | NEARBY ZIP CODES | OTHER FULLERTON TOPICS |
|---|---|---|---|
| Anaheim Real Estate | Sunny Hills Real Estate | 92624 Real Estate | Apartments for Rent in 92831 |
| Buena Park Real Estate | | 92655 Real Estate | Houses for Sale in 92831 |
| Costa Mesa Real Estate | | 92678 Real Estate | Houses for Rent in 92831 |
| Fullerton Real Estate | | 92831 Real Estate | 92831 Real Estate |
| Garden Grove Real Estate | | 92832 Real Estate | Fullerton Condos |
| More | | More | More |

900 N Acacia Ave, Fullerton, CA, 92831 is a single family home of 1,374 sqft on a lot of 7,687 sqft (or 0.18 acres). Zillow's Zestimate® for 900 N Acacia Ave is $616,461 and the Rent Zestimate® is $2,650/mo. This single family home has 3 bedrooms, 2 baths, and was built in 1955. The 3 bed single family home at 1409 Alto Ln in Fullerton is comparable and priced for sale at $950,000. This home is located in Fullerton in zip code 92831. Sunny Hills is a nearby neighborhood. Nearby ZIP codes include 92834 and 92836. Anaheim, Orange, and Buena Park are nearby cities.

**ABOUT**   **ZESTIMATES**   **RESEARCH**   **JOBS**   **HELP**   **ADVERTISE**   **TERMS OF USE & PRIVACY**   **AD CHOICE**

**COOKIE PREFERENCES**   **BLOG**   **MOBILE APPS**

© 2006-2016 Zillow        Follow us     



100% Recycled fiber
80% Post-Consumer

RECEIVED

U.S. DISTRICT COURT

**Extremely U**

FOLD HERE

International Shipping Notice— Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

https://www.ups.com/uis/create?ActionOriginPair=default__PrintWindowPage&key=label/Window&type=html&occ=en_US&instr=A&doc=shipment_10919866...   1/1

Visit **ups.com®** c
to schedule a pi

**Domestic Shipments**
· To qualify for the Let
  correspondence, urg
  weigh 8 oz. or less. I
  those listed or weigh

**International Shipmen**
· The UPS Express Env
  value. Certain count
  ups.com/importexpo

· To qualify for the int
  UPS Express Enve

**Note:** Express Envel
containing sensitive pe
or cash-equivalents



| | | |
|---|---|---|
| HEIDI BELL<br>3073529577 307<br>935 WILDERNESS TRAIL<br>GREEN RIVER WY 82935 | **1 LBS**<br><br>DWT: 11,9,1 | **1 OF 1** |

**SHIP TO:**
    CLERK OF COURT
    (402) 661-7350
    ROMAN L. HRUSKA FEDERAL COURTHOUSE
    111 SOUTH 18TH PLAZA SUITE 1152
    **OMAHA   NE 68102-1322**

## NE 681 9-01

**UPS 2ND DAY AIR**                                    **2**
TRACKING #: 1Z 1X7 F91 NY 9423 0569

BILLING: P/P
ATTENTION UPS DRIVER: SHIPPER RELEASE

UPS 187#.33.   WNTN/WO 72 0A 01/2016

ROMAN L HRUSKA FEDERAL COURTHOUSE
111 S 18TH PLZ
STE 1152
OMAHA NE 68102

P: BERK    S: MGREEN I: 117

**114-1810**
1Z1X7F91NY9423 **0569**
GLZZCDY NEOMA265   Mar 24 06:51:02 2016
US 6814 HIP 15.9.3 LP2B44

This envelope is f...

ts on this side.

Serving you for more than 100 years
United Parcel Service.

010195101   1/15   TG   United Parcel Service




